### ANDERSON v. PILGRAM.

1. CASE.—The attention of the bar called to the propriety and necessity of correcting all errors and mistakes in the copies of the "Case" filed with the clerk for the use of the court.

2. FINDINGS OF FACT—FRAUDULENT COMPROMISE.—This court concurring with referee and Circuit Judge, that a compromise was made by a debtor with his debtors for the purpose of defeating the payment of a debt adjudged to be valid, the compromise was declared to be a fraud on the part of this debtor, even though he did not consider himself morally bound to pay the debt which he sought to defeat.

3. IBID.—IBID.—INNOCENT PARTIES.—But the debtors in the compromise having undertaken to pay other debts due by their creditor, and given new notes in part, they occupy the position of purchasers for value; and the circumstances not showing that they participated in their creditor's fraudulent intent, or had notice of it, the transaction was valid as to them.

4. FRAUDULENT CONVEYANCE—ACTION—ISSUES.—A voluntary transfer of notes by an insolvent husband to his wife, is fraudulent as to his creditors, but all questions as to the validity of these notes should properly be made in action brought by the sheriff, if the notes have been attached, or by a receiver appointed in this action, if not attached; and if judgment be obtained, then the maker of the notes can raise the question of homestead. Such questions are not proper in this case, though all the parties are before the court.

5. COSTS—SUPPLEMENTARY PROCEEDINGS.—Costs incurred by plaintiffs in recovering property fraudulently disposed of by their debtor, may be ordered to be paid out of the fund recovered, but not costs of supplementary proceedings instituted against such debtor, and dismissed or abandoned. Costs of such proceedings can be recovered only under order of the judge who renders judgment in the matter.

6. PETITION FOR REHEARING refused.

Before WALLACE, J., Spartanburg, July, 1893.

Action by W. A. and L. S. Anderson, in behalf of themselves and other creditors, against S. M. Pilgram, Lula Pilgram, E. S. Darwin, and Sallie A. Darwin. The report of the master, H. B. Carlisle, was as follows:

This is an action brought by the plaintiffs herein and others, creditors of S. M. Pilgram, to set aside as fraudulent and void, certain transfers and compromises made by him, whereby they claim to have been prevented from collecting their just debts. The facts out of which this arose are as follows:

On September 29th, 1883, S. M. Pilgram sold to E. S. Darwin and S. A. Darwin 371 acres of land, taking their note, secured by mortgage, for $5,500. On or about March 13th, 1885, said Pilgram brought suit on said note and mortgage, and obtained a decree for foreclosure. The amount then reported due by the referee was $6,100. After the decree had been filed, attorneys seem to have been employed to prevent a sale of the premises by injunction, but before any steps were taken in furtherance of this object, a settlement was agreed upon by the parties, which was substantially as follows: The old note and mortgage was taken up, and new notes given, dated February 10th, 1886, amounting to $5,400, and due at different dates. On March 6th, 1886, an agreement was signed by S. M. Pilgram, stating the terms of the compromise, and binding himself not to enforce any judgment he might afterwards obtain, with the exception of the $800 note, mentioned hereafter, against the mortgagors personally, but to confine himself to the proceeds of the land. On this date another note was given by them to S. M. Pilgram for $800. On the date of the original notes there was one given for $500, not secured by the mortgage. On this judgment was afterwards obtained.

On September 9th, 1885, S. M. Pilgram purchased from W. A. and L. S. Anderson one house and lot in the town of Woodruff, giving his note and mortgage therefor, for $1,400, due in several instalments. One of these notes was afterwards assigned to the plaintiff, A. B. Woodruff. The mortgage over the property has been foreclosed, and there is still a large amount thereon due plaintiffs as a deficiency. On January 12th, 1887, the defendant assigned the two $800 notes to his wife, the defendant, Lula A. Pilgram, taking therefor her note for $75. This $75 note seems to have been lost, or, at any rate, has never been produced in court, and has never been paid. About three weeks afterwards Pilgram was served with the summons in case of *Anderson* v. *Pilgram*, and before the assignment had been frequently urged to pay this debt, or compromise it in some way. All offers of compromise were rejected, Pilgram saying he would not give them five cents for a compromise. All he would do was to return the property, claiming that the understanding was that no personal judgment should be rendered against him. The court, however, when the cause came to trial, decided that there was no such agreement, and, of course, that judgment is now binding upon all parties, and the debt, for the purposes of this suit, must be considered an equitable one.

At the time of this transfer to his wife, Pilgram was indebted in the sum of about $2,300, and his assets consisted of these notes against the Darwins and the house and lot bought from Anderson, which had greatly depreciated in value. Pilgram was examined before a referee in the case of the *Port Royal R. R. Co.* v. *Pilgram*, and his explanation of this transfer to his wife at that time, was that it was a *bona fide* sale, and that he considered the trade a good one. Now he says it was done in contemplation of his death, he being sick at the time, and in order to make provision for his wife and to enable her to realize more from his estate than her distributive share.

In February, 1889, S. M. Pilgram began suit to foreclose his mortgage, and at the same time his wife sued on the notes assigned to her. The feeling between Pilgram and Mrs. Darwin was very bitter, and had been for some time. The Darwins

answered, claiming that the amount sued for was more than they owed, and also pleading his written agreement not to obtain judgment against them personally. On or about April 10th, 1888, the whole matter was compromised between them by the Darwins assuming the railroad debt and the notes of Judge Nicholls and E. S. Allen, giving Pilgram two notes for $300 each, without security, making the consideration, in all, about $1,700. The face value of the notes surrendered at that time was something over $5,000, after making due allowance for alleged errors. The testimony of S. M. Pilgram and B. M. Lanford, and all the facts and circumstances of this case, show conclusively that said Pilgram did not intend to pay this debt of Anderson's, and his whole purpose, throughout all these transactions, seems to have been to get his property in such a shape that it could not be reached by execution. He detailed his plan to one of the witnesses some time before the commencement of this suit, and seems never to have departed from it. Plaintiffs have used every effort to collect their debts, even offering the Darwins $17 an acre for the land, if they would take as part payment therefor the notes of Pilgram, but the parties have always refused. The testimony of A. B. Woodruff is that Darwin and his wife would always seem willing to compromise with Pilgram until the suggestion was made that the money be paid on their debts, and that would end the matter. One of the $300 notes has been paid off, after being assigned by S. M. Pilgram, and the other is still in his possession. As to the value of the land, or what it would likely have brought at public sale in 1888, a finding at this time is very difficult. After carefully examining the conflicting testimony on this point, I find that $10 an acre was a fair valuation of the land at that time, and it would probably have brought about that at public sale.

From the above statement of facts I make the following findings of law—law and fact being necessarily somewhat blended in a case of this kind. I will first discuss the transfer by Pilgram to his wife of the two $800 notes. As the principles governing a transfer for a consideration, even if inadequate, are different from those involved in a voluntary deed, it will be

necessary to determine under which class this falls.   Mr. Pilgram says in his testimony that he took his wife's note for $75 for the transfer, that said note has never been collected, and that it has been misplaced.   He also stated that his object in taking the note was that in case of his death without children, she should appear as a purchaser for value, and be able to hold the notes against his other heirs.   This view of the defendant himself militates very strongly against his testimony that he intended to collect the note, and the explanation does not tally with the one given before the referee some years before.   At that time he said he made the transfer because he thought $75 was a good trade for the notes.   Anderson had been pushing him for his debt for some time before this, and threatening suit, and the inference to be drawn from these facts is very strong, showing conclusively that the note given by the wife was never intended to be collected, and that the transfer consequently was voluntary.   Under these facts it is not necessary for plaintiffs, in order to set this transaction aside, to prove that the wife took part in or was ever cognizant of the fraud.   The law itself sets its seal of condemnation upon such a transfer, and declares it void as against creditors.   The principle is well settled that a voluntary deed is fraudulent by operation of law, where the event shows that existing creditors are thereby prejudiced, without reference to the question whether there was any actual or moral fraud in the transaction.   *Jackson* v. *Lewis*, 34 S. C., 1; *Wagener* v. *Mars*, 27 S. C., 97; *McGowan* v. *Hitt*, 16 S. C., 602. So that under this view of the case there is no necessity for a finding as to whether there was any actual conspiracy between husband and wife to defeat creditors.

But it is contended on behalf of defendants that even if the gift was voluntary, still as Pilgrim had after the transfer enough property to pay his debts, the gift must be sustained.   This raises a somewhat difficult question of law; but fortunately the point has been passed upon by our court in numerous cases. *Hudnall* v. *Teasdall*, 1 McCord, 227; *McElwee* v. *Sutton*, 2 Bail., 128; *Izard* v. *Middleton*, Bail. Eq., 228; *Brock* v. *Bowman*, Rich. Eq. Cas., 185; *Jackson* v. *Lewis*, quoted above.   The motive which prompts the donor to make the gift is wholly immaterial.

If he is indebted at the time, and the event proves that it is necessary to resort to the property attempted to be conveyed away by a voluntary deed for the purpose of paying such indebtedness, the voluntary conveyance will be set aside and the property subjected to the payment of such indebtedness, upon the ground that it would otherwise operate as a legal fraud upon the rights of creditors, even though the transaction was free from any trace of moral fraud. Applying these principles to the transfer from Pilgram to his wife, it is clear that the transaction cannot stand. It was made at a time when he was considerably indebted, it was made without consideration, and resort to these notes has become necessary for the purpose of paying the debts existing at the time. All this state of affairs has been brought about through no fault on the part of the plaintiffs, for the records show that they have exhausted every remedy in the vain effort to collect their debts.

The next and principal question in this case is, can the compromise with the Darwins, made in 1888, stand as against these plaintiffs? As to the quantity of proof required to establish a case of fraud, there has been great contrariety of opinion, but the safest and soundest rule seems to me to be laid down by Judge Black, of Pennsylvania, as follows: "It is said that fraud must be proved, and must never be presumed." This proposition is true only in a qualified and limited sense. It amounts to but this, that a contract, honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence of some kind, either positive or circumstantial. It is not true that fraud can never be presumed. *Kaine* v. *Weigley*, 22 Pa. St., 183. Fraud may be, and generally, if proven at all, must be, inferred from facts and circumstances. 6 Am. St. Rep., 864; 65 Am. Dec., 155. It is very clear from the testimony, that Pilgram never intended to pay the Anderson and Woodruff debts. His testimony, of itself, is sufficient to show this, and it is strongly corroborated by his actions and by his conversations with B. M. Lanford. Whatever may have been his object in providing for the payment of all his other debts and leaving this out, whether it was because he thought the claim unjust, or not, cannot affect this case. The fact remains, that

he never intended to pay it, and that he was prepared to dispose of his property and convert it into such a shape that it could not be reached. His testimony, to the effect that the claim is unjust, only adds strength to the position taken by plaintiffs, that he was seeking to defeat their claims. The compromise and subsequent assignment of one of [*sic*] furthering his expressed purpose of disposing of the property and avoiding the payment of the debt. So, then, it seems pretty clear that Pilgram's object in making this compromise was to prevent the collection of the Anderson debt.

Now, were his codefendants participants in his fraud, or did they have any knowledge of it? On or about February 1st, 1888, S. M. Pilgram began suit for the foreclosure of the mortgage given by S. A. and E. S. Darwin, and at the same time Mrs. Lula A. Pilgram began a separate action on the $800 note not secured by the mortgage. The whole amount shown by the face of the papers to have been due at that time was about $6,400. Defendants put in an answer, claiming that the notes were for too large an amount, and alleging that the unsecured note was without consideration and void. Allowing them the benefit of the positions they set up by their answer, the amount due on notes was something like $5,000. The whole matter was compromised by the Darwins assuming the Nicholls, Allen, and railroad debt, and giving two unsecured notes for $300 each, the whole consideration amounting to about $1,700. At this time, Pilgram had been sued on the Anderson and Woodruff claims, and Anderson and Woodruff had made repeated offers to buy the land from the Darwins, provided their claims against Pilgram should be taken as part payment, and these offers had always been refused. None of the defendants would listen to any offers of compromise which brought in the Pilgram claims. Under all the circumstances of this case, I do not see how the very liberal compromise made between Pilgram and the Darwins can be allowed to stand.

The principal defence relied upon by defendants is, that even if Pilgram intended to defraud his creditors by this transfer, still there is no evidence that Mr. and Mrs. Darwin were aware of that intention. I believe from the testimony that the Dar-

wins effected this compromise rather with a view to obtaining
a personal advantage themselves, but their object was carried
out in such a way that it enabled Pilgram to defraud his cred-
itors.   They took advantage of this purpose of Pilgram's to
save their land at the expense of his creditors.   As is said in
one case, "An act innocent in the intention may be so injurious
in its consequences that the law declares it to be a fraud, and
forbids it."   It is not necessary to show that the intention of
the grantee or donee was to assist the donor in defeating his
creditors; but if it be established that the donor had such in-
tention, and that the purchaser knew of its existence, or had
knowledge of facts sufficient to put him upon notice, then the
transaction will be set aside.   Wait Fraud. Conv., 290; Bump.
Fraud, 303, 232.   The testimony shows the land to have been
worth about $3,500, and the court will not allow an insolvent
debtor to make his sister a present of some $800, when its
practical effect is to prevent the debts being paid.   I have not
detailed all the facts and circumstances brought out in the tes-
timony which forces me to this conclusion, but an examination
of the evidence shows many badges of fraud.   I reach this
conclusion somewhat reluctantly, because it does look as if the
Darwins had been somewhat imposed upon by their codefend-
ant, Pilgram.

Another point raised by the defendants is that the plaintiffs
are barred by the supplementary proceedings commenced by
them in 1888.   The report of the referee was filed in 1891, in
which it was held that the plaintiffs were barred by their laches
from further prosecuting the supplementary proceedings, and
since then nothing has been done with the case, and it seems to
have been abandoned.   The judgment creditor may abandon
supplementary proceedings commenced by him, and proceed
by creditor's bill.   Wait Fraud. Conv., 95.   In fact, it is a
doubtful point whether he may not invoke both remedies at
the same time.   I find, therefore, as matters of law, that
plaintiffs are not barred by the supplementary proceedings.

In the most favorable view of the testimony for the Darwins,
the amount which was due from them to the defendant, S. M.
Pilgram, at the date of the alleged settlement, and of which he

could have enforced collection, was considerably more than enough to pay all the debts which were then due by the defendant, S. M. Pilgram, to the plaintiffs and his other creditors, whose claims have been proven in this case. I, therefore, recommend that the transfer of the two notes for $800 each, made by the defendant, S. M. Pilgram, to his wife, the defendant, Lula A. Pilgram, and the settlement of the indebtedness of the defendants, E. S. and S. A. Darwin, to the defendant, S. M. Pilgram, alleged to have been made between them, be adjudged fraudulent and void, and that the cancellation of the mortgage given by the Darwins to the defendant, S. M. Pilgram, be likewise adjudged fraudulent and void, and that the said mortgage be adjudged a valid and subsisting lien upon the real estate therein described, except so much thereof as was sold by the Darwins to E. S. Allen by consent of the plaintiffs, the proceeds of which went to pay off the Allen debt and the Nicholls debt; and that the defendants, E. S. and S. A. Darwin, be required to pay into the hands of the master of this court enough of their indebtedness to the defendant, S. M. Pilgram, to pay off the indebtedness of the latter to the plaintiffs and the other creditors, whose claims have been proved in this case, together with the costs and disbursements incurred by his said creditors, and also the costs and disbursements of this action; that upon their doing so within a reasonable time, to be fixed by the decree of the court herein, that the alleged settlement between the defendants be allowed to stand. But upon their failure to do so within the time so fixed, that the 271 acres of land, more or less, covered by the mortgage and not sold to E. S. Allen, be sold under the order of this court, and the proceeds applied to the payment of the said debts, costs, and disbursements, and that the plaintiffs have judgment against the defendant, S. A. Darwin, for the amount due upon the $800 note, bearing date March 6th, 1886, given by her to the defendant, S. M. Pilgram, and not included in the mortgage, or for so much thereof as shall be necessary to pay said debts, costs, and disbursements.

*Messrs. Bomar & Simpson,* for appellants.

*Messrs. Carlisle & Hydrick,* contra.

July 27, 1894.   The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER.   The plaintiffs, as judgment creditors of the defendant, S. M. Pilgram, bring this action on behalf of themselves, as well as all other judgment creditors of the said Pilgram, who shall come in and seek relief thereby, and contribute to the expenses thereof, for the purpose of setting aside as fraudulent a compromise of a certain debt held by said Pilgram against his codefendants, E. S. Darwin and S. A. Darwin, as well as the transfer of certain notes originally held by Pilgram, one against both of the said Darwins and the other against S. A. Darwin, to his wife, Lula A. Pilgram, with a view to subject said debts to the payment of their said judgments.   It is stated in the decree of the Circuit Judge, though the order of reference is not set out in the "Case," that, by the consent of all parties, it was referred to a special referee "to take testimony, hear and determine all issues arising herein, and make his report to this court, with leave to report any special matter," &c.   The referee made his report, to which exceptions were filed by the defendants, "same as their grounds of appeal," and the case came before his honor, Judge Wallace, for a hearing on said report and exceptions.   His honor, in his decree, without entering into any discussion of the questions presented, simply affirmed the conclusions, both of fact and law, reached by the referee, and rendered his decree confirming said report, and adding certain details as to the manner in which the conclusions reached should be carried into effect.

From this decree, the defendants, E. S. Darwin, S. A. Darwin, and S. M. Pilgram, appeal upon the several grounds set out in the record, which need not be repeated here, as some of the grounds have been abandoned, and others not pressed, while others still have been acquiesced in by the respondents, who have consented that the decree be modified as therein suggested.   We propose, therefore, to consider and determine the several questions which we understand to be raised by the grounds of appeal; and for this purpose it is necessary that the report of the referee should be incorporated in the report of the case, as it is too long for insertion here.   Inasmuch as

there is no appeal from so much of the decree as adjudges that the transfer of the notes referred to above, by Pilgram to his wife, should be set aside, it is unnecessary to consider that portion of the decree, especially as we agree with the master and the Circuit Judge upon that point. The main controversy is, whether the compromise with the Darwins by Pilgram, to which reference has been made, should be set aside, together with certain questions incidental thereto, which will hereafter be referred to; whether there was any error in failing to pro-vide for the exemption claimed by S. M. Pilgram under the homestead laws; and whether the Circuit Judge erred in re-spect to the costs adjudged by him to be paid.

First as to the compromise. It seems that on the 29th of September, 1883, Pilgram sold to E. S. Darwin and S. A. Dar-win a tract of land containing 371 acres, taking their note, secured by a mortgage of the premises, for $5,500, claimed to be an extravagant price for the property—a claim which the evidence seems to justify. On the 13th March, 1885, Pilgram commenced an action to foreclose this mortgage, and obtained judgment by default for the sum of $6,100. Soon after this judgment was recovered, the Darwins employed counsel for the purpose of enjoining the sale of the mortgaged premises, but before any steps were taken, a settlement was agreed upon, the terms of which were embodied in a paper signed by Pilgram, under seal, and dated 6th March, 1886, a copy of which is set out in the "Case." In this paper, Pilgram acknowledges the receipt of $6,400 from the Darwins, in full of all judgments against them, and states that the amount received consisted "of money, cotton, mortgage, order for rent, and deed for two acres of land;" and although no notes are mentioned, it seems that several notes, aggregating the sum of $5,400, were given, which, we presume, were secured by the mortgage mentioned. And Pilgram binds himself to look alone to the land mortgaged for the payment of all the notes held by him, except the note of S. A. Darwin for $800. In the meantime, to wit: on the 9th of September, 1885, Pilgram bought a house and lot in the town of Woodruff from the plaintiffs, W. A. and L. S. Anderson, for the sum of $1,400, giving his notes, secured by a mortgage of

28—41

the house and lot, one of which notes was afterwards transferred to the plaintiff Woodruff. On the 28th of January, 1887, an action was commenced to foreclose this mortgage, and judgment was recovered, some time in 1889 (this is the date as stated at folio 232 of the "Case," but the probability is that this is a mistake, and the true date is 5th of April, 1888), of foreclosure and sale; and when the property was sold, it brought only $505, leaving a large deficiency, for which judgment was entered against Pilgram. And the claim is, that it was to defeat this judgment that the compromise hereinafter referred to was made.

It is stated in the referee's report, that in February, *1889*, Pilgram commenced his action for the foreclosure of his mortgage to secure the notes of the Darwins, aggregating $5,400, but this must be another mistake, for we find in another part of the "Case" that the complaint in this action was verified on the 10th of February, *1888;* so that we presume the action was really commenced in February, 1888, and not in 1889, as stated in the referee's report. These mistakes, and other discrepancies found in the "Case," prompts us to call the attention of counsel to the importance of seeing to it that all errors, arising from misprint or otherwise, in the "Case" are corrected; for, to say nothing of the additional and unnecessary labor imposed upon the court, by a neglect to observe this precaution, it may sometimes lead to serious injury to the parties, as the court is bound to take the facts as they appear in the "Case" as prepared for argument here. We throw out this admonition with less reluctance, because, we are pleased to be able to say, that the counsel engaged in this cause are usually noted for their diligence and accuracy in the preparation of their papers.

This action brought by Pilgram against the Darwins, in February, 1888 (as we assume), was compromised on the 10th of April, 1888, by the Darwins assuming the payment of three debts due by Pilgram—one to Port Royal and Western Carolina Railway Company, one to Mr. Nichols, and the other to E. S. Allen—and giving to Pilgram two notes, without security, of $300 each, making, as the referee finds, the consideration for

the surrender of notes, amounting at their face value to something over $5,000, about $1,700. The testimony shows that both the Nichols and Allen debts have been paid, as well as one of the $300 notes to Pilgram, and that the Darwins had offered to pay the debt to the railway company, which offer was declined by counsel representing that company, probably for the reason that its acceptance might be regarded as a recognition of the compromise sought to be set aside by these proceedings, to which, as we understand it, the railway company has become a party. So that, passing by, for the present, the two notes for $800, previously transferred to Mrs. Pilgram, all that would remain for the Darwins to pay, if the compromise is allowed to stand, would be the debt to the railway company and the outstanding note for $300 to Pilgram, of which we find no account in the testimony.

We fully concur in the view taken both by the referee and the Circuit Judge that, so far as Pilgram is concerned, his purpose being to defeat the payment of a valid, legal obligation, the compromise was, in the eye of the law, a fraud. For even taking the most charitable view of his conduct, that he did not think he was morally bound to pay the judgment for the deficiency in the proceeds of the sale of the house and lot in the town of Woodruff to meet the mortgage debt, because, as he claimed, the plaintiffs had agreed to look alone to the proceeds of the sale of the mortgaged premises for the payment of their debt, yet that question having been adjudged against him, he must be regarded as just as liable to pay such deficiency as he would be to pay any other legal and valid obligation, and the law will not countenance any effort on his part to evade its payment.

But the fact that his act in making the compromise was fraudulent so far as he was concerned, does not necessarily affect the Darwins. Unless they participated in the fraudulent intent of Pilgram, or having knowledge or notice of such intent, availed themselves of such knowledge for the purpose of obtaining a personal advantage to themselves, at the expense of Pilgram's creditors, they cannot be held liable; for they are not volunteers, but stand in the position of pur-

chasers for a valuable consideration. This proposition of law is in accord with the authorities cited by the referee and by respondent's counsel, and is also conformable to reason and the plainest dictates of justice.

As we understand it, the referee relieves the Darwins of any guilty participation in the fraudulent intent of Pilgram, but he holds, though in somewhat dubious language, that the Darwins had notice of Pilgram's intent, and took advantage of that purpose of Pilgram's to obtain a personal advantage to themselves. His language is: "I believe from the testimony that the Darwins effected this compromise rather with a view to obtaining a personal advantage to themselves, but their object was carried out in such a way that it enabled Pilgram to defraud his creditors." (Exactly what this means it is somewhat difficult to say.) "They took advantage of this purpose of Pilgram's to save their land at the expense of his creditors." It is to be noted, however, that the referee nowhere finds that the Darwins knew of Pilgram's purpose to evade the payment of his debt to the plaintiffs. If he believed so, it would have been very easy to say so. But he could not have so found, for we have been unable to find anything in the testimony that even tends to show any such knowledge on their part. The undisputed testimony shows, and the referee so finds, that up to the time of this compromise the feeling was very bitter between the Darwins and Pilgram, and it is scarcely possible that he would communicate to his bitter enemies his purpose to commit a fraud. Again the referee says: "The testimony shows the land to have been worth about $3,500, and the court will not allow an insolvent debtor to make his sister a present of some eight (probably another misprint for eighteen) hundred dollars, when its practical effect is to prevent debts being paid. I have not detailed all the facts and circumstances brought out in the testimony which forces me to this conclusion, but an examination of the evidence shows many badges of fraud." This last quotation, it seems to us, shows that the referee confounded the fraud of Pilgram with the supposed knowledge of the Darwins of the fraudulent purpose of Pilgram. Finally, he concludes this portion of his report with these words: "I reach this conclu-

sion somewhat reluctantly, because it does look as if the Darwins had been somewhat imposed upon by their codefendant, Pilgram."

Whether this compromise was so glaringly liberal to the Darwins as the referee seems to suppose, admits of grave question, when it is remembered that by the terms of the agreement of 6th of March, 1886, hereinbefore referred to, Pilgram had bound himself to look alone to the proceeds of the sale of the mortgaged premises for the payment of the notes aggregating $5,400, for even the *estimated* value of the mortgaged premises falls far short of paying that sum. And when the experience of Pilgram in the sale of his own house and lot under the judgment of foreclosure obtained by the plaintiffs, resulting in such a large deficiency, is recalled, it would not have been unreasonable to apprehend that the sale of the Darwin land, in the same neighborhood, might result in a proportionate deficiency; and, if so, then the amount received by Pilgram under the compromise would not fall short of the amount which he was likely to realize from his claims against the Darwins. The offer of the plaintiffs to give the Darwins $17 an acre for their land was burdened with the condition that they should receive as a part of the purchase money the claims held by the plaintiffs against Pilgram, which condition they could not safely accept without the consent of Pilgram, for if they acquired these claims after Pilgram had commenced his action against them, they could not have been set up by way of discount or counter-claim in such action. Again, this compromise does not seem to have been made in the dark, but, on the contrary, was advised and urged by the friends and neighbors, including one of the plaintiffs.

As we understand it, this compromise did not include the two notes of $800 each—the one signed by both of the Darwins, and the other by S. A. Darwin alone; for we do not see how they could have been included in a settlement to which Mrs. Pilgram does not appear to have been a party, and, so far as appears, had no knowledge of at the time, for she was then the lawful owner and holder of these notes, at least so far as Pilgram was concerned. The Darwins, when

sued upon these notes, set up defences thereto, alleging want of consideration, and Mrs. Darwin set up a further defence, under the married woman's act, to the action on the note signed by her alone. These defences have never been considered, and should not have been passed upon in the present action. But now since it has been adjudged, with the approval of this court, that the transfers of these notes were fraudulent, so far as the creditors of Pilgram are concerned, and since, as we understand it, these notes, together with all other evidences of indebtedness from the Darwins to Pilgram, have been levied upon as the property of Pilgram under the warrant of attachment obtained by the plaintiffs, we see no reason why these notes may not be sued by the sheriff, or if these notes have not been attached, then a receiver may be appointed, as prayed for in the complaint in this action, who may bring suit upon these notes, when the Darwins may set up their defences, and have the same properly adjudicated; and if judgment be recovered, then the proper steps can be taken to set up the claim of E. S. Darwin to exemption under the homestead laws, which claim, it does not seem to us, can well be adjudicated in this action.

It only remains to consider the effect of the supplementary proceedings instituted by the plaintiffs, as well as by Port Royal and Western Carolina Railway Company, and the liability for the costs thereof. It appears from the "Case," that in April, 1888, the plaintiffs obtained an order for the examination of the Darwins before a referee, appointed for that purpose, on the 13th of April, 1888; but owing to sickness in the family of the Darwins, they did not appear on that day, and it was agreed that some subsequent day should be appointed for the purpose; but no further steps were taken until the 25th of June, 1891, the day before this action seems to have been commenced. On that day the parties appeared by counsel, when a motion to dismiss the proceedings was made and granted. To the report of the referee to this effect, no exceptions were filed, and no further steps appear to have been taken in the matter. This, it seems to us, was an end of those proceedings, which does not, in our judgment, bar the present action. On

the 28th of February, 1888, the railway company instituted similar proceedings, under which Pilgram and E. S. Darwin appear to have been examined. Subsequently, but at what date does not appear, the referee made his report, which, however, was never filed, recommending the appointment of a receiver to take charge of the notes of the Darwins to Pilgram, with authority to bring suit to recover the amounts due thereon. No further steps appear to have been taken under those proceedings, which must be regarded as abandoned. Such proceedings do not, therefore, constitute a bar to the present action.

In the decree, the Circuit Judge directed that, in addition to the debts due to the plaintiffs and the other judgment creditors of Pilgram, whose claims have been proved in this case, the Darwins should pay "the costs and disbursements incurred by his (Pilgram's) said creditors, and also the costs and disbursements of this action incurred by them." And in the concluding portion of the decree we find these words: "Costs and disbursements, mentioned above, shall include all costs on judgments against the defendant, S. M. Pilgram, and the costs and disbursements of the supplemental proceedings in the case of the Port Royal and Western Railway Company against the defendant, S. M. Pilgram, including the sum of $15 to the plaintiff's attorney in that case. As to the costs of the supplementary proceedings in the other cases, they are left open for further order." Now, while there may be no objection to providing for the costs incurred by the plaintiffs and the other judgment creditors of Pilgram, in recovering their judgments out of any money which may be realized under the attachment, or by a receiver, in accordance with the views hereinbefore announced, we see no reason for requiring the payment of the costs of the supplementary proceedings, for one of them was dismissed and the other seems to have been abandoned, and the costs of such proceedings must, therefore, fall upon the parties who instituted these fruitless proceedings. Indeed, so far as we can discover, the only provision for costs in supplementary proceedings is that found in section 321 of the Code, which reads as follows: "The judge may allow to the judgment creditor, or to any party so examined, whether a party to the

action or not, witness fees and disbursements, and a fixed sum in addition, not exceeding thirty dollars, as costs." By this we understand the judge before whom such proceedings are brought for confirmation or reversal of the referee's report, and as neither of these proceedings proceeded beyond the report of the referee, no such allowance as that contemplated by the section quoted was, or could have been, made.

The judgment of this court is, that the judgment of the Circuit Court, except in so far as it has been approved above, be reversed, and that the case be remanded to that court for the purpose of carrying out the views herein announced.

In this case plaintiffs filed a petition for rehearing, alleging several errors in the decision of this court. Upon this petition the following order, signed by the Chief Justice and Mr. Justice Pope (Mr. Justice McGowan's term of office having expired July 29), was endorsed, dated and filed September 14, 1894:

"After a careful consideration of this petition, we are unable to perceive that any material question of fact or principle of law has either been overlooked or disregarged in the decision heretofore rendered, and hence there is no ground for a rehearing. It is, therefore, ordered, that this petition be dismissed, and that the stay of the remittitur heretofore granted be revoked."